2024 IL App (1st) 240409-U

No. 1- 24-0409B

Order filed May 30, 2024

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT
_____

| | | |
|---|---|---|
| PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 16 CR 1621802 |
| | ) | |
| CHRISTOPHER SMITH, | ) | Honorable |
| | ) | Jennifer Coleman, |
| Defendant-Appellant. | ) | Judge Presiding |

_____

JUSTICE ELLIS delivered the judgment of the court.
Presiding Justice Howse and Justice McBride concurred in the judgment.

**ORDER**

¶ 1    *Held*: Affirmed. State proved by clear and convincing evidence all elements necessary for denial of pretrial release.

¶ 2    Defendant Christopher Smith was arrested in 2016 on charges of murder and attempted murder. After the passage of the law eliminating cash bond and allowing previously-detained inmates to seek pretrial release again, defendant sought a new hearing, and the State petitioned for his continued detention.

¶ 3    The trial court detained defendant, finding him to be a threat to the public and determining that no set of conditions could mitigate that threat. Defendant appeals. We find no error and affirm.

¶ 4    Defendant is charged with the first-degree murder of Tracey Morgan and the attempted first-degree murder of Morgan's mother, Darlene Jones. Defendant has been in custody since his arrest on September 28, 2016.

¶ 5    On January 30, 2024, defendant filed a motion to review bond. In support of his motion, defendant argued that there were no eyewitnesses who would identify him; there were no confessions; there was no weapon recovered; and there was no physical evidence connecting him to the shooting.

¶ 6    On February 6, 2024, the State filed a petition to deny pretrial release. The State alleged that the proof was evident and the presumption great that defendant committed the detainable offenses of first-degree murder and attempted first-degree murder; that defendant posed a real and present threat to the safety of an individual and the community; and that no condition or set of conditions of pretrial release could mitigate that threat.

¶ 7    A hearing was held on the State's petition and defendant's motion on February 6, 2024. The State proffered the following information.

¶ 8    On October 13, 2015, defendant and Morgan attended a parole meeting at 7745 South State Street. While Jones waited outside the meeting in her car to drive Morgan home, she noticed a silver car with tinted windows parked nearby; the silver car had an X on its license plate. When the meeting ended, Morgan left and got in the front passenger's seat of Jones's car. As Jones and Morgan drove home on Lafayette Avenue, the silver car Jones had seen earlier began to follow them.

¶ 9    Jones continued to drive southbound on Lafayette Avenue, but as she prepared to turn right onto 83rd Street, the silver car passed her on the left, cut her off, and blocked her car from moving. At that point, another car stopped behind Jones, boxing her in. Once Jones was blocked from moving, "several male individuals exited and approached her vehicle on the passenger's side and began to shoot into her vehicle in Morgan's direction."

¶ 10    Jones was shot once in her arm. Morgan was shot 11 times "all over his body." Morgan died from his injuries. The State told the court that "[i]t is believed those two shooters are *** the defendant, the other is co-defendant Khalil Yameen." As far as motive, the State explained that defendant and his co-defendant were members of the "Killa Ward" faction of the Gangster Disciples street gang, while Morgan was in a rival gang, the Bang Bang Gang/Terror Dome faction of the Black P. Stone street gang—two gangs that had been feuding at the time. The feud had led to multiple shootings and, after Morgan and Jones were shot, "it is believed that the P. Stones retaliated against the Gangster Disciples with the mindset that the shooting of family members was no longer off limits."

¶ 11    Five days after Morgan and Jones were shot, the Terror Dome P. Stones retaliated. Although the intended target of the retaliation was Deshari Bowens, a Killa Ward Gangster Disciple, Brianna Jenkins was killed. Dwright Doty, a Bang Bang gang member and "close associate" of Morgan, was convicted of Jenkins's murder. Fifteen days after Jenkins' murder, the Terror Dome P. Stones retaliated again when they lured Tyshawn Lee, the son of Killa Ward Gangster Disciple Pierre Stokes, into an alley and executed him. Stokes then retaliated by attempting to kill Robyn Matthews, the girlfriend of Morgan's brother.

¶ 12    The State conceded that there were no eyewitness identifications of defendant as the shooter but argued that there was ample circumstantial evidence. The shooting happened at

approximately 8:26 p.m. near 8250 South Lafayette Street. The sign-in records from the parole meeting, held at 7745 South State Street, places defendant there with Morgan.

¶ 13    The evidence shows that multiple cell phone communications took place during the relevant window of time between defendant and the co-defendant. Phone records from defendant and his co-defendant showed them texting at 7:30 p.m. while the parole meeting was in session. The co-defendant called defendant at 8:25 p.m. Both phones pinged the cell tower nearest the location of the parole meeting. The murder occurred at 8:26 p.m. "just a few blocks away from the [parole] meeting." The co-defendant's phone was "hitting off of a tower just past the murder scene on Lafayette at 8:27 p.m., one minute after the murder." Defendant's phone pinged a cell tower several blocks away from the murder.

¶ 14    The surviving victim, Jones, stated that there were multiple shooters, but she did not see their faces. Seventeen shell cases were recovered at the scene of the murder: five from a "380 caliber and 12 *** from a 40 caliber corroborating that there were two guns and two shooters."

¶ 15    A few hours after the murder, defendant called the mother of his child and told her that he was at the parole meeting with Morgan and called someone, instructing them to bring a gun to the meeting. According to the mother of defendant's child, defendant told her that he and several other people followed Jones's car, cut her off, got out of their car, and "aired the car out." She later contacted the police after the murder of Tyshawn Lee and provided grand jury testimony about defendant's statements.

¶ 16    Defendant's criminal history includes a January 2011, residential burglary; an August 2011 residential burglary (while the first residential burglary case was pending); a December 2011 residential burglary (while on probation for the first two residential burglaries); and an

October 2012 residential burglary (while on parole for the third residential burglary). While on parole for the fourth residential burglary, defendant allegedly committed the charged offenses.

¶ 17 Defendant objected to the court considering the events that happened after the murder, claiming they were irrelevant. Defendant argued that the State had not met its burden, as defendant was not identified as the shooter, he made no confession to the murder, a weapon was not recovered, and there was no physical evidence linking him to the crime. The case, said defendant, was "purely circumstantial."

¶ 18 Defendant argued that electronic monitoring was a sufficient condition to mitigate any dangerousness and ensure his appearance in court.

¶ 19 In mitigation, defendant stated that he had obtained his GED and earned several certificates while in jail; he has a 13-year-old daughter; he did not have any crimes of violence in his background; and he did not have any bond forfeitures and was not a flight risk. Defendant submitted several letters from correctional officers explaining that he had not been in trouble while in jail.

¶ 20 The court acknowledged the numerous letters of support from correctional officers and recognized that defendant was "doing a lot of work in the jail" and was "doing well there." But the court could not "ignore the serious nature of the offense." The court found that the State had shown by clear and convincing evidence that defendant committed the offenses. Though there was no identification, there were "cell towers placing him at the scene, him being at the same parole meeting as the victim, [and] his confession to his ex-girlfriend after the fact," all of which established "that the State has shown that he committed the offense."

¶ 21 The court also found that defendant poses a real and present threat to the safety of any person or persons or the community. The court explained that defendant shot a rival gang

member immediately after attending a parole meeting and he has four prior convictions for residential burglary, which was a crime the trial court considered to be "very serious." The court likewise found it to be "very egregious that [defendant] shot this victim not only in front of his mother, but also shot the victim's mother[.]"

¶ 22    The court also found that there were no conditions that could mitigate defendant's dangerousness. The court noted that defendant was on probation for residential burglaries when he "picked up the third case" and was on parole for the third case when he "picked up the fourth one." The court concluded that defendant was "not inclined to follow orders of this court" and believed that there were no conditions that could mitigate defendant's dangerousness.

¶ 23    The court clarified that it was not considering the portion of the People's proffer regarding the "chain of events that led to more and more death and destruction in the community."

¶ 24    Defendant filed a notice of appeal on February 14, 2014. Appellate counsel has opted not to file a supporting memorandum. The State filed a memorandum on appeal urging affirmance.

¶ 25    Defendants are presumed eligible for pretrial release. 725 ILCS 5/110-2(a) (West 2022); *id*. § 110-6.1(e). The State may detain an accused only if it establishes that the charged offense is eligible for detention and proves that (1) the proof is evident or the presumption great that the defendant committed that detention-eligible offense; (2) the defendant poses a real and present threat to the safety of any person or persons or the community, based on the specific articulable facts of the case, or the defendant poses a threat of willful flight; and (3) no condition or combination of conditions can mitigate that real and present threat or flight risk. *Id*. § 110-6.1(e).

¶ 26    The State must prove each of these three facts by clear and convincing evidence. *Id.* Clear and convincing evidence is "that quantum of proof that leaves no reasonable doubt in the

mind of the factfinder about the truth of the proposition in question." *In re Tiffany W.*, 2012 IL App (1st) 102492-B, ¶ 12. If the State fails to carry its burden on any of these three facts, the presumption of release remains, and detention is unlawful. 725 ILCS 5/110-6.1(e) (West 2022).

¶ 27 Our standard of review is unsettled. The author of this opinion is of the belief that detention orders should be subject to independent *de novo* review, with findings of historical fact reviewed for manifest error. See *People v. Whitaker*, 2024 IL App (1st) 232009, ¶ 80 (Ellis, J., specially concurring); *People v. Saucedo*, 2024 IL App (1st) 232020, ¶ 67 (Ellis, J., specially concurring). The other panel justices believe that the first two factual findings—those of proof-evident and dangerousness or flight risk—should be reviewed for manifest error, while the third factual finding regarding conditions should be reviewed for an abuse of discretion. See *Saucedo*, 2024 IL App (1st) 232020, ¶¶ 31-36 (majority opinion); *People v. Parker*, 2024 IL App (1st) 232164, ¶¶ 44-50.

¶ 28 We need not resolve the standard of review here, however, as our decision would be the same under any standard of review.

¶ 29 We begin with the notice of appeal, which, absent a supporting memorandum filed by appellate counsel, defines the scope of our appellate review and constitutes the only written argument to this court. This appeal was initiated before the recent changes to our supreme court rule governing PFA appeals. Under the previous version of the rules in effect at the time, defendants were provided a written, more detailed notice of appeal that included various points of error already typed out; the defendant could literally check that box and thus trigger that argument on appeal. The detailed notice of appeal also contained lines beneath each point of error for the defendant to elaborate on the error with facts or law specific to that case (or, of course, the defendant could attach additional pages for elaboration).

¶ 30    Here, private counsel drafted its own notice of appeal. In it, counsel rewrote each of three different points of error nearly verbatim from the detailed notice of appeal provided by the supreme court before the rule changes:

"a. The State failed to demonstrate, by clear and convincing evidence, that the proof is evident or the presumption is great that the Defendant committed the offense of first-degree murder;

b. The State failed to demonstrate, by clear and convincing evidence, that the Defendant poses a real and present threat to the safety of any person or persons or the community, based on the specific, articulable facts of the case;

c. The State failed to demonstrate, by clear and convincing evidence, that no condition or combination of conditions set forth in 725 ILCS 5/110-10(b) can mitigate a real and present threat to the safety of any person or persons or community, based on the specific, articulable facts of the case, or that less restrictive conditions would not avoid a real and present threat to the safety of any person or persons or the community."

¶ 31    But that is all that is contained in the notice of appeal—no elaboration, merely the three points of error recited by counsel. It is the functional equivalent of a defendant merely checking the three boxes on the supreme court-provided detailed notice of appeal but writing nothing else. And again, the public defender on appeal did not see fit to file the optional supporting memorandum. So we are left with almost no basis on which to grant relief to defendant other than the boilerplate language parroting state law—compared, on the other side, to a comprehensive opposition memorandum filed by the State.

¶ 32    Fortunately, under the rules now in effect, requiring a written motion for relief in the circuit court as a prerequisite to appeal, every PFA appeal in the future will be accompanied by

at least one, if not two written legal arguments that must contain not merely boilerplate language but specific detail, with case law and citations to the record. See Ill. S. Ct. R. 604(h)(2) (eff. April 15, 2024); see *id*. R. 604(h)(7) ("the form of the appellant's arguments must contain sufficient detail to enable meaningful appellate review, including the contentions of the appellant and the reasons therefor and citations of the record and any relevant authorities"). But this appeal predates those rule changes in relevant part.

¶ 33    Regardless of the competence of the pleadings before us, we have little hesitation agreeing with the circuit court that detention is warranted here.

¶ 34    There is no dispute that defendant is charged with detainable offenses. Regarding the first prong of evident proof, we find that the State met its burden. The circumstantial evidence places defendant squarely amid the victim and the shooting. Defendant asked his child's mother for a gun and admitted his involvement in the shooting to her. These are only allegations at this point, of course, and nothing here should be construed as negating the presumption of innocence at trial and the State's burden of proving the requisite elements beyond a reasonable doubt. But for our purposes here, there is clear and convincing evidence that defendant committed these offenses.

¶ 35    The State also sufficiently proved that defendant poses a threat to the community. The crimes alleged were premeditated, cold-blooded murder and attempted murder. Defendant also has a record of committing the serious offense of residential burglary on repeated occasions.

¶ 36    As for the adequacy of pretrial conditions, we agree with the trial court that the fact that defendant committed several of his residential burglaries during the pendency of, or while on parole for, other such offenses suggests that he is unlikely to abide by any pretrial conditions set by the court. He also (allegedly) committed the murder and attempted murder while on parole.

Defendant's affiliation with a violent street gang, for whom he allegedly carried out an execution, only further supports the trial court's determination.

¶ 37     The judgment of the circuit court is affirmed.

¶ 38     Affirmed.